ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Metal Trades, Inc. | ) ASBCA No. 62966 |
| | ) |
| Under Contract No. N39430-21-C-2201 | ) |

APPEARANCES FOR THE APPELLANT:    Mr. Shaun Flynn
   President
  Ms. Megan B. Dean
   Director of Contracts/Business Development

APPEARANCES FOR THE GOVERNMENT:    Craig D. Jensen, Esq.
  Navy Chief Trial Attorney
  Michael J. Garcia, Esq.
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE CLARKE PURSUANT TO RULE 12.2

    This decision is issued in accordance with Board Rule 12.2[1] which was elected by Metal Trades, Inc. (MTI). We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. Our factual analysis is intentionally longer than necessary for a Rule 12.2 Expedited Decision in order to fully consider what happened. We conclude the Navy's ratification was based on mistaken facts and it improperly used cost analysis demanding cost data from MTI in this small fixed-price contract which prejudiced MTI.

FINDINGS OF FACT

*August 2019 to September 2019 the Navy, GSA and MTI Work to Agree on a Price*

    1. On August 02, 2019, Megan Dean, Director of Contracts/Business Development, Metal Trades, Inc. emailed Mr. Kevin Flynn (K. Flynn),[2] Navy, Subject: Follow up on INLS Training Module. Ms. Dean thanked Mr. K. Flynn for a phone call and said MTI was "anxious to start this quoting process." Ms. Dean also said she had contacted the GSA contracting officer (CO) to facilitate getting this item

---

[1] A decision under Rule 12.2 shall have no value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.
[2] There are two Mr. Flynns, Mr. Shaun Flynn is MTI's President, Mr. Kevin Flynn is with the Navy.

on MTI's GSA contract. GSA recommended advertising as an RFQ on eBuy to satisfy any competition requirement. (App. supp. R4, tab 1 at 12)

2. On August 02, 2019, Mr. K. Flynn emailed Ms. Dean, Subject: Follow up on INLS Training Module. Attached to the email was a preliminary drawing of the project that was estimated to be finalized "next week." (App. supp. R4, tab 1 at 11)

3. On August 05, 2019, Ms. Dean emailed Mr. K. Flynn and other Navy personnel, Subject: Follow up on INLS Training Module. Ms. Dean thanked the Navy for sending MTI information on the project and that she had her estimators working on the estimate to have a price available as soon as possible. (App. supp. R4, tab 1 at 11)

4. On August 13, 2019, Ms. Dean emailed Mr. K. Flynn and other Navy personnel, Subject: Follow up on INLS Training Module – quick question. Ms. Dean asked if shipping was to be included in their quote and if so please identify the ship-to address. (App. supp. R4, tab 1 at 8)

5. On August 14, 2019, Ms. Dean, emailed Mr. K. Flynn and other Navy personnel, Subject: INLS Training Modules – MTI Quote 219276. Attached to the email was MTI's quote "per the drawing you sent us on 08/11/19."[3] Also, "[o]nce you all approve cost, we can move forward as expeditiously as possible to get this on GSA and procured." (App. supp. R4, tab 1 at 7)

6. On August 19, 2019 Ms. Tracie Crower, GSA, emailed Ms. Dean, Subject: INLS Training Module –MTI Quote 219276 – GSA. Ms. Crower stated GSA would need a couple of quotes and an exact delivery location but it was up to the agency on how they sought competition. Ms. Dean responded the same day stating the barge would be offered delivered and that MTI should be able to get several quotes to show completion. (App. supp. R4, tab 1 at 14)

7. Also on August 19, 2021, Ms. Dean emailed Mr. Chang, Navy, forwarding the GSA email on the same day asking for an exact delivery address and that the agency did not have to use eBuy. The Navy could probably buy the barge directly from MTI at the agreed upon price. (App. supp. R4, tab 1 at 13)

8. Also on August 19, 2020, Ms. Dean emailed Ms. Crower to "connect" her with Mr. Chang because the Navy was working on securing funding to buy the barge off of GSA "asap to meet fiscal year-end sales." (App. supp. R4, tab 1 at 15)

---

[3] The attached quote is not in the record.

9. In an internal MTI email to Mr. Shaun Flynn and others dated August 20, 2019, Ms. Dean wrote, "See exact delivery address below for INLS. Can we please update our towing cost? I need a couple (If possible) quoted please to satisfy GSA RQMT. I'll need copy of estimates in order to add towing as delivery option." (App. supp. R4, tab 2 at 17)

10. In an August 20, 2019 email to Mr. Chang, Ms. Dean wrote:

> Thank you so much Mr. Chang for this information. It is extremely helpful for us since we had assumed Norfolk delivery. We are updating quotes for towing based on the information you provided below.
>
> One of the companies we are getting a towing quote from said they were familiar with your facilities and asked us if the Navy would have the ability to pick this module up out of the water? This supplier also noted to us that whoever delivers this module will need to consider this in their quote and possibly arrange some land based transport. Therefore can you please confirm at your earliest, will the Navy consider acceptance of this module pier side? Or, is the above a valid concern and do we need to take this into consideration when quoting?

(App. supp. R4, tab 2 at 19)

11. On August 21, 2019, Mr. Smith, Stevens Towing, sent MTI a quote as follows:

> Stevens Towing Co., Inc. can offer the following quotation for an INLS training module (80" L x 25' B x 12' D @ 50,000 lbs) from Yonges Island, SC to Williamsburg, VA:
>
> Barge transportation $78,500.00
> Crane barge discharge and delivery to final location $45,000.00.

(App. supp. R4, tab 2 at 20)

3

12.  In an August 22, 2019, MTI internal email to Mr. Crites and Mr. Barnes, Ms. Dean wrote:

> Thank you for this quote. Was George at KMD able to quote? I have a call into LCDR Boyd that emailed us back yesterday to get a better idea of the logistics for this move. In order to get on GSA I have to show at least 2 quotes, even if astronomical. So, I need to really understand what needs to occur to final delivery so I can accomplish this.

(App. supp. R4, tab 2 at 20)

13.  On August 23, 2019, Mr. Detyens, KMD Marine, sent MTI a quote for transportation:

> Please find the following options for ILNS delivery from Yonges Island to Cheatum Annex VA
>
> A) Towing ILNS on own bottom
> $48,000.00
> Includes 8hrs free time on delivery
> Demurrage $300.00/hour
> Fuel NTE $2.25/gallon
>
> B) ILNS on deck barge
> $80,000.00
> Includes 8hrs free time each end
> Demurrage $400.00/hour
> All Loading, unloading, barge prep/clean to others account
> All risk cargo insurance available as cost reimbursable -
> Cargo Legal Liability included
> Fuel NTE $2.25/gallon
>
> C) Offloading:See provided estimate from Crofton Industries. Please let me know if you have any questions
>
> I assume MTI will load and secure. I can take of[f] Crofton and unloading expense if you would like at cost plus 20%. Or MTI can handle direct.

(App. supp. R4, tab 2 at 22-23)

14. On August 23, 2019, KMD Marine submitted a proposal "to provide a floating crane, riggers and tug service to mobilize and lift 1 ea. Ilns Unit (80x25x12 approx 50,000#) from the deck of the transport barge and set into water at Cheatham Annex. Crane plans must be submitted and approved prior to entry (est. 5 days)." The total amount was $27,770. (App. supp. R4, tab 2 at 24)

15. On August 23, 2019, Ms. Dean sent an email to the Navy, Subject: INLS Training Modules – MTI Quote 219276 – GSA,

> I hope this email finds you both well. I have been trying to reach you all via phone since yesterday I know you are out of the office, but I need some insight please into your facilities so that I can accurately quote and offer you all the most cost efficient solution for delivery of this INLS Training Module. I know you said that using the pier as a delivery option is not allowable. Therefore, our subcontractors are quoting barge transport from MTI to Williamsburg and then adding an additional fee to bring in a crane barge for discharge and delivery to final location. *As you can imagine, this is very costly to you as the customer.* Also worth mentioning, there is an exception that "loading, securing, or discharging the cargo (unless optional discharge/delivery is requested)" is excluded from the price offered. Therefore, I am hopeful to speak to you to better understand the lay of the land of your facility.
>
> • Most notably, would it be possible for us to get a land based mobile crane to the pier to offload since this will be a much more efficient option than rental of a crane barge?
> • How far does this module have to transit from water to land to meet your final destination?
> • Can we leave it delivered set on the pier?
> • Will customer be able to offer support for loading, securing, discharging as noted in price exclusion?
>
> Any additional information you can provide would be extremely helpful for me to figure this out logistically.

(App. supp. R4, tab 2 at 25) (emphasis added)

16. On August 23, 2019, Ms. Dean emailed the Navy stating in part:

> I really appreciate the revised drawing, Kevin. Please see
> our revised quote. Note: the fabrication cost reduced due
> to smaller unit but due to the confirmation of the exact
> shipping location the freight increased. Please note on
> revised quote we broke out freight for you all. I need to
> caveat our quote with freight is subject to change.

(App. supp. R4, tab 3 at 31)

17. On September 1, 2019, Ms. Dean sent the following email to the Navy:

> Please see MTI's attached revised quote IAW Rev B. I
> will move forward getting this added to MTI's GSA
> schedule asap. Hopefully I can get it added by Weds. I
> will keep you updated and please let me know if you have
> any questions or concerns on your end. One quick note:
> the caveat as stated last time remains- the freight is subject
> to change.

(App. supp. R4, tab 3 at 39)

18. On September 2, 2019, Ms. Dean emailed Ms. Crower, GSA, the
following:

> With pending Hurricane Dorian, I wanted to get ahead of
> this and get the mod submitted. I sent the updated quote to
> customer yesterday based on their Rev B drawing. Praying
> everything is right with the mod! Attached is the total
> package I uploaded into the e-mod system for your
> information and approval. The emod ID is 8RUP8Z6V.
> Please let me know if there is anything else you need or if
> anything is wrong. Hopefully, if something is wrong, I
> will be able to fix it asap (assuming we have power).

(App. supp. R4, tab 4 at pdf 42/194)

*MTI's Quote and Internal Estimate*

19. By email dated September 1, 2019, MTI sent the Navy, Mr. K. Flynn,
MTI's quote (app. supp. R4, tab, 4 at 39). MTI's quote, dated September 4, 2019,

6

addressed to Mr. K. Flynn, NAVFAC, for "INLS Crane Training Intermediate Module – Approx 64' x 25' x 10'," "FOB: Williamsburg, VA – (12) weeks ARO" at a price of $280,627.31. This price was made up of Barge Fabrication cost ($132,427.31), Barge (water) Freight Costs ($94,200) and Land Freight Costs ($54,000) or $148,200 total freight, slightly higher than the price for the barge. (App. supp. R4, tab 3 at 40)[4] Profit was included in the prices. This quote is supported by MTI's Internal Job Estimate[5], date illegible, that indicated a contract value of $280,627.31 consisting of a cost of $249,822.77 and profit of $30,804.54 which is 12% or 11% depending how it is calculated[6]. This estimate included total freight of $135,695.17 without profit[7]. Profit on the barge and freight is included in the $30,804.54. (App. supp. R4, tab 12 at 177)

20. On September 9, 2019, Ms. Dean emailed the Navy as follows:

> We are back to work and power has been restored. Sorry for the lost time last week. With the hurricane and GSA having to process exigency orders, this took longer than expected to complete. BUT, I wanted to update you that I received the mod package from my GSA KO on Sat, and I just signed it! The cost I uploaded for this item is as listed on the attached quote. I will get it loaded into eBuy asap for you all to purchase.
>
> NOTE: MTI's GSA Contract Number is GS-07F-121BA. I added this to SIN 260-12. Please let me know where you all are with this on your side? Hopefully we can get this procured by weeks end. If anything changes on freight, as I noted before, I/we can modify the cost later.

(App. supp. R4, tab 4 at 44)

21. On September 10, 2019 Ms. Crower, GAS, sent Ms. Dean the following email:

> This is my Email verification that PN MTI IM TM was recently approved on 9/9/2019, Modification PO-0013,

---

[4] We do not know why the email is dated September 1, 2019, and the quote is dated September 4, 2019.

[5] MTI's estimate was not included with the quote at this time.

[6] Depending on how profit is calculated, 12% is $30,804.54 / $249,822.77 = .123 or 11% is $30,804.54 / $280,627.31 = .109.

[7] The freight of $135,659.17 is a little less that the $148,200 for freight in the September 4, 2019 quote that included profit.

under the Metal Trades GSA Contract GS-07F-121BA
at the GSA Customer Price delivered to Williamsburg, VA
of $279,920.44.

The SIP File for GSA Advantage will take a few days to
process but it has been submitted.

(App. supp. R4, tab 4 at 46)

22. MTI's offer was listed on GSA contract GS-07F-121BA, SIN 260 12 as "Improved Lighterage System Intermediate Module (IM) Training Module (TM) Delivered to Williamsburg VA" at a price of $279,920.44." (App. supp. R4, tab 4 at 52)

*The Navy Signs the Requisition for MTI's Barge*

23. On or about September 13, 2019, Mr. Sakowski, COS (Chief of Staff) signed (Block 10) a DD Form 1149, REQUISITION AND INVOICE/SHIPPING DOCUMENT, number V81464 9256 5550, dated 20190913. The requisition was issued to "GSA VENDOR, METAL TRADES, INC, P.O. BOX 129, HOLLYWOOD, SOUTH CAROLINA 29449" (Block 2). The material was required on September 13, 2019, the same day (Block 7). The DD1149 was "from" V81464, SUPPLY OFFICER, NAVELSG-N41, 593 MAYFIELD STREET, WILLIAMSBURG, VA 23185. It was to be shipped to NAVELSG V81464 N41, 593 MAYFIELD STREET, WILLIAMSBURG, VA 23185, POC: LS2 JALEEL DABREO (Block 3). The "authority or purpose" was INLS TRAINING AID (Block 9). CLIN 1 was "INLS CRANE TRAINING INTERMEDIATE MODULE APROX 64' X25' X10'." APPROPRIATIONS DATA was "1791804.6C6C 0000 C582A E 056521 2D V81464 9256 5550 PC" (Block 4). The "unit price" was $132,427.31, BARGE FREIGHT COST $94,200and LAND FREIGHT COST $54,000 for a total of $280,627.31. (Gov't R4, tab 1 at 5) In his declaration Mr. Sakowski stated he was not a contracting officer and had no contracting authority (gov't R4, tab 2 at 11). Otherwise, the DD 1149 was completely filled out with all necessary information including fund cite.

24. By email dated September 16, 2019, the Navy, Mr. Jaleel Dabreo, N41 Financial/Stock Control, sent Ms. Dean a "WAWF" number to allow MTI to invoice for payment:

The document number to reference for WAWF Invoices is V81464-9256-5550. I attached a copy of our WAWF table in case you need it as well. Thank you and please let me know if there is any way I can assist you.

8

(App. supp. R4, tab 5 at 56)

*The Barge Arrives*

25.  On January 28, 2020, LCDR Boyd, Director of Logistics and Expeditionary Support (N4), emailed Ms. Dean the following:

> Good afternoon. The INLS Training Aide has arrived!
> Thanks.
> It was offloaded yesterday.  The stanchions caused some transport delays on base; it was a curve ball for the contractor.  But, this morning the crew resumed and moved it the rest of the way to the training location.  We haven't tested it out yet, but it looks like what we were going for! We'll click the buttons on our end to make sure all the funding goes through.  *Thank for you and your company's professionalism and communication during the construction and delivery process.  This is a definitely a "win" for our unit!!*

(App. supp. R4, tab 6 at 62) (emphasis added)

*MTI Tries to Get Paid*

26.  On January 28, 2020, Ms. Dean emailed the Navy, LCDR Boyd, stating the following:

> I just wanted to circle up to make sure all went well with the delivery.  I assume no news is good news?  Also, *I just wanted to thank you for being such a wonderful customer.* You really helped to make this project go smoothly.  Hope the end product is what you all need and wanted and that we can hopefully support you all again in the future!

(App. supp. R4, tab 6 at 63) (emphasis added)

27.  On January 21, 2020, MTI sent an invoice in the amount of $280,627.31 to Mr. David Boyd, Navy, for review and processing.  The invoice included INLS Crane Training Module, $132,427.31, Barge Freight Costs, $94,200, and Land Freight Cost, $54,000.  (App. supp. R4, tab 6 at 67-68)

*Unauthorized Commitment*

28. On August 13, 2020, Ms. Sanchez wrote:

> Megan,
>
> Just keeping you in the loop... We are still working on the unauthorized commitment ratification document. I am currently waiting for the technical team to answer some questions that were asked by one of the reviewers. Looks like this is taking much longer than I had anticipated.

(App. supp. R4, tab 7 at 70) This is the first mention of an unauthorized commitment ratification in the record.

*MTI Makes a Mistake on the Profit*

29. On 24 August, 2020, Ms. Dean emailed Ms. Sanchez the following:

> *The $24,700 was for profit.* This subcontractor cost for $123,500 was turnkey as broken out on the description of their invoice I just sent you. This profit was calculated with a simple 20% mark up on the $123,500. Therefore, there is nothing to break out. Please let me know if you need anything else or have any other questions.
>
> *In addition, when we added the INLS to GSA we had to show cost reasonableness through obtaining multiple quotes.* I provided this information and this invoice and proof of payment to David Boyd on 07/17/2020. Attached FIO.
>
> I don't have any additional information to provide.

(App. supp. R4, tab 8 at 80) (emphasis added). The $24,700 is comprised of Labor, $5,659, Cranes, $1,400, Transporter, $1,050, and Mark Up, $16,591 totaling $24,700. (App. supp. R4, tab 12 at 139-140) The profit of $16,591 for freight is 11%.[8] MTI was mistaken when it told the Navy the $24,700 was all profit.

---

[8] $16,591 / $148,200 = .112

30.  On September 8, 2020, Ms. Dean emailed CO Koplos as follows:

> Thank you for your time on the phone.  I just spoke to Shaun.  Please proceed with immediate release of the uncontested $255,927.31.  Please confirm this amount matches what you are proposing is uncontested to make sure I didn't mistype it.  MTI is going to proceed with filing a claim for the additional $24,700 we are owed and we also intend to seek interest payment for the months the payment has been delinquent.

(App. supp. R4, tab 9 at 87)

31.  The record contains an unsigned Determination and Findings for Ratification of Unauthorized Commitment (D&F) (gov't R4, tab 1 at 3).  The D&F included a timeline of events that included, "It is evident that the Government parties did not know they were supposed to issue and execute an order off the contract/schedule as required by Federal Acquisition Regulation (FAR) 8.4 and DFARS 208.4."  (*id.* at 5)  The D&F included:

> MTI's quote for freight was $148,200 and the IGE was $123,500 for a difference of $24,700.  The markup added by MTI is their added cost to the subcontractor's proposed cost and accounts for the difference of $24,700.  NAVFAC finds no support for the markup, and the IGE did not include a markup in their project analysis. . . . With the lack of contractors who can perform this transport and the complexity of moving the training module 450 miles, plus the safety and infrastructure challenges in moving the oversized module to Cheatham Annex, NAVFAC finds the cost acceptable with the exception of the $24,700 mark up.

(*Id.* at 7)  The record does not include the referenced Independent Government Estimate (IGE) analysis / calculation.  If it exists the Navy did not put it in the record.

*MTI Submits a Formal Claim*

32.  MTI's formal claim for $24,700 is dated September 14, 2020 and addressed to CO Koplos. (App. br. at 23-24)  Enclosure 2 was a copy of MTI's internal estimate (*id.* at 25) with a correction of an administrative error. (*Id.* at 23 ¶ 4)  Whatever the correction was it did not change the estimate.  The New Contract Value remained the

same at $280,627.31, Cost, $249,822.77 and Profit $30,804.54. The cost for freight was $135,659.17. The overall profit of $30,804.54 or 11%[9] was included in the $280,627.31. (*Id.* at 25) There are also labor hour logs for "Rigging" January 14, 2019 through January 18, 2019 but without explanation we are not sure how they apply to this claim. MTI concluded the claim letter with the following:

> We urge the Government to reconsider this decision to reduce the reasonable request for payment owed to Metal Trades, Inc. for this order and we request to be paid interest as allowable under FAR 33.208. *The precedence the Government has established in this situation of causing unnecessary hardship on a small business who fulfilled our obligation to the Government, when there was knowingly gross negligence and error on behalf of all involved in this order is disheartening, extremely disappointing, and reprehensible.* We look forward to a favorable response to our claim and to being made whole for the amount we have been shorted ($24,700).

(App. br. at 24) (emphasis added)

33. On September 14, 2020, Ms. Dean emailed CO Koplos as follows:

> Attached please see MTI's formal claim letter requesting the additional money owed to MTI in the amount of $24,700.
>
> There are 4 total attachments:
>
> 1. Metal Trades, Inc. Formal Claim Letter
>
> 2. Enclosure 1- Freight Costs
>
> 3. Enclosure 2- Revised Estimate and Time Clock Proof of Hours to support Freight
> 4. Enclosure 3- Email to Ms. Sanchez demonstrating DOD Precedence of 20% on other orders

---

[9] $30,804.54 / $280,627.31 = .1097

12

We appreciate your time to review and look forward to your favorable response to this claim. If you have any questions or concerns, please advise.

(App. supp. R4, tab 8 at 83-84)

*The Navy Refuses to Consider MTI's Formal Claim*

34. On September 26, 2020, CO Koplos emailed Ms. Dean as follows:

I have received your Formal Claim. At this time, there is no contract between the parties and therefore no Disputes or any other clause on which your Formal Claim may be based. Therefore, your Claim is premature and will not be considered. Also, I am unable to open your attachment entitled, "ATT00001."

(App. supp. R4, tab 8 at 83)

*The Unauthorized Commitment is Ratified but at a Lower Price*

35. The Unauthorized Commitment was ratified in Contract No. N3943021C2201, effective November 25, 2020, which was agreed to for the manufacture of the INLS Training Aid (Barge) and freight in the amount of $255,927.31. MTI's Mr. Shaun Flynn and CO Koplos both signed on November 30, 2020. The amount is $24,700 less than what the Navy and MTI agreed to at time of the requisition on September 13, 2019. The parties understood that MTI was not giving up its claim for $24,700. (App. supp. R4, tab 10 at 91-94)

36. In his declaration, CO Koplos explained that a ratification of $255,927.31 was the largest ratification he had seen and it was not uncommon for such a ratification to take fourteen months. (Gov't R4 at tab 2 14) CO Koplos accepted GSA's price for the barge itself as fair and reasonable but according to GSA it included 18% profit he thought was high. CO Koplos testified in his declaration:

The fact that this action was a ratification of an unauthorized commitment meant that MTI had the benefit of knowing their ACTUAL costs for freight and associated costs, since the ratification process took place far after delivery. The exactly 20% markup on freight that was later described as an "administrative error" was never justified to me as an actual cost associated with freight.

13

. . . .

> The basis for my fair and reasonable determination on the module itself rested on GSA's fair and reasonable determination, which included an 18% profit for the production of the module, which I considered somewhat high, but acceptable in this case in the interest of time. Namely, had I chosen to do my own *cost analysis*, it would have taken months longer. Further, I would have likely justified a lower profit resulting in a reduced overall ratified amount by nearly $8,000.

(Gov't supp. R4 at tab 2 15-16) (emphasis added) CO Koplos explained that he disallowed the 20% markup on freight ($24,700) given the higher than usual 18% profit on the barge. CO Koplos also stated MTI had not produced certified payrolls he requested. (*Id.* at 16) He also stated, "Quantum meruit would dictate the *actual hours expended* would be the correct amount to be paid, not the $16,591 that has no basis as to the labor expended and especially accounted for after the fact." (*Id.* at 16-17)

37. On December 8, 2020, the CO, Ms. Megan Ault, signed SF 30, Modification No. P00001 to Contract No. N3943021C2201 DATED (SEE ITEM 13) 25-NOV-2020. The Modification was issued by NAVFAC EXWC, CODE ACQ / NAVAL BASE VENTURA COUNTY, 1100 23RD AVE BLDG 1100, PORT HUENEME CA 93043-4301. It was issued to METAL TRADES, INC, MEGAN B. DEAN, 4194 HWY 165, YONGES ISLAND SC 29449-6041. The Facility Code was 4G424. Block 13 E, read, "Contractor is not required to sign this document." BLOCK 13 C read "THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-1 Changes Fixed-Price (Aug 1987)." Block 14 DESCRIPTION OF AMENDMENT/MODIFICATION: "This administrative modification is to change the Pay DODAAC from N50082 to Pay DODAAC N68732 to match the Line of Accounting. All other terms and conditions remain the same." There are no dollar amounts on this SF 30. (R4, tab 2 at 7)

38. On December 8, 2020, the Navy, Ms. Crystal Brooks, Contract Specialist, sent MTI the following email Subject N3943021C2201 Modification:

> Attached is the fully executed modification for your contract. The Pay DODAAC has been changed from N50082 to the correct pay DODAAC N68732. Please ensure when submitting the invoice that you use the N68732 DODAAC. Please refer to the email instructions that were sent to Daniel Reed to make the correction on renaming the invoice and the inclusion of the Accepted

14

DODAAC and Inspected DODAAC for the 2-n-1 invoicing. You can proceed to resubmit your invoice for payment. My apologies for the inconvenience, if you have any questions please do not hesitate to ask. Have a great day.

(R4, tab 3) The modification corrected a Navy DODAAC number needed by MTI for payment of its invoice. There was no mention of a price change.

39. On January 5, 2021, Ms. Dean sent the following email to various Navy personnel:

> Good morning Ms. Brooks, Ms. Contreras, and Mr. Koplos,
>
> Happy New Year to you all. I am reaching out with an urgent request for an update please. To date we still have not been paid for the INLS/Subject contract. As you are aware we submitted the invoice on 12/07 only to realize it was rejected because there needed to be a modification on one of the lines of accounting. You promptly modified the contract on 12/08 to correct the error and Daniel resubmitted the invoice. It is possible you replied directly to Daniel, but below is the last correspondence I have record of and to date **we still have not received payment**. Since it is almost 1 year exact to the date MTI in good faith delivered this product to the Government for their operational use, you can imagine that we are ready to be paid and that it is imperative for us to receive payment as soon as possible. Can you please check the status of our invoice submission and advise asap on the anticipated release of the funds to MTI?
>
> Thank you for help and quick response and hopefully the expedited release of these funds.

(App. supp. R4, tab 10 at 119)

15

40. On January 07, 2021, CO Koplos sent out the following email within the Navy:

> For clarity, this invoice is against a ratification contract I put in place after receipt of the product. As the cognizant KO, I confirm receipt in accordance with the contract.

(App. supp. R4, tab 10 at 116)

41. On January 11, 2021, the following email was sent out within the Navy:

> Please process the subject invoice for payment today. The vendor is a small business and the invoice is past due. Let Joyce know when the invoice is ready to certify.

(App. supp. R4, tab 10 at 115)

*MTI Receives the $255,958.41*

42. On January 20, 2021, MTI received payment of $255,958.41 and Ms. Dean wrote the following email to CO Koplos:

> MTI received our payment today in the amount of $255,927.31 with an interest payment of $31.10 for a total received amount of $255,958.41. Therefore, we are re-submitting the claim for the additional funds owed in the amount of $24,700 plus interest. Now the ratification has been completed, payment made, and acknowledgement there was in fact a contract as FE on 11.30.2020 and as referenced in the subject and the letter, we are requesting your reconsideration of our substantiated claim.

(App. supp. R4, tab 11 at 122)

43. On March 29, 2021, Ms. Dean emailed CO Koplos the following:

> I don't mean to continue to pester, but we are looking forward to your response on our claim which to date has exceeded 60 days. Please kindly advise the status. If you are no longer the best POC for this or if I need to start working this through the GAO, please advise.

(App. supp. R4, tab 11 at 127)

16

*CO Koplos Again Denys MTI's Claim*

44.  On May 3, 2021, CO Koplos emailed Ms. Dean as follows:

> Your request for the mark-up on freight was previously
> denied as not being a fair and reasonable charge under the
> unauthorized commitment ratification.  Consistent with my
> previous communication, I am again denying your request.

(App. supp. R4, tab 11 at 127)

45.  By email dated June 29, 2021, MTI submitted to the Board a request for guidance.  The Board treated the email as a notice of appeal and docketed it as ASBCA No. 62966 on July 6, 2021.

*MTI Objects to the Navy's Position that Leaves it with No Profit on Freight*

46.  In its September 16, 2021 response to the government's first set of interrogatories, MTI wrote in part concerning the $16,591 mark up:

> Note:  this is actually **under** 13% profit on this item which
> is fair and reasonable.  *MTI is entitled to profit on the*
> *freight and should not be expected to offer this delivery to*
> *Government at Cost.*  See Enclosure 3 of original claim
> sent on 1/20/21 which demonstrates 11 % is fair and
> reasonable for mark up, since in the past MTI has received
> 20% Mark Up on other Government and DoD Contracts.
> Historically, Metal Trades, Inc. uses 20% markup on items
> that are high risk.

(Italics added) (App. supp. R4, tab 12 at 140)

## DECISION

We start by pointing out that this record supports our conclusion that MTI's performance on this procurement has been for the most part impeccable.  We cannot say as much for the Navy.

17

*Positions of the Parties*

The Navy lists the issues in this case as follows:

> The issues in this case are:
>
> (1)  Whether, pursuant to FAR 1.602-3(c)(4), a contracting officer may partially ratify an unauthorized commitment when he believes the price was not fair and reasonable; and
>
> (2)  If so, whether the Board may disturb the contracting officer's determination of what constitutes a "fair and reasonable" price pursuant to an express ratification under FAR 1.602-3.

(Gov't br. at 2)  The Navy also contends:

> Further, the determination of a "fair and reasonable" price, pursuant to an express ratification, is inherently a matter of the contracting officer's discretion that cannot be disturbed unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [and] [t]he [Board] is not empowered to substitute its judgement for that of the agency."

(Gov't br. at 3)  Notably, the Navy does not challenge our jurisdiction to consider this appeal.  In any event, for today's purposes, we agree that a contracting officer has the authority to partially ratify an unauthorized commitment so the remaining issue is can the Board "disturb" a contracting officer's "fair and reasonable" price determination. The answer is of course we may consider the reasonableness and factual support for CO Kolpos' decision, because a decision that is not supported by the facts is not in accordance with the regulation.

For its part MTI relies on the facts and writes:

> MTI cannot argue the basis of law, as we are representing ourselves pro se, but our argument here is that we should be paid for many reasons—but above all else, because we simply don't understand why [we] wouldn't be paid with everything we have provided. It just seems to pay our small business what we are owed is the right thing to do.

(App. br. at 7)

18

*Burden of Proof*

We need not sort out who has the burden of proof because, just like unilateral definitization, unilateral ratification is complicated, *See Lockheed Martin Aeronautics Co.*, ASBCA No. 62505, 20221 WL 2912101, and makes no difference in the ultimate decision.

*The 18% Profit on the Barge was Mistaken*

We put the Navy's use of 18% profit on the barge up front because it is the most critical piece of evidence supporting the Navy's argument. Mr. Koplos' explained the 18%:

> The basis for my fair and reasonable determination on the module itself rested on GSA's fair and reasonable determination, which included an 18% profit for the production of the module, which I considered somewhat high, but acceptable in this case in the interest of time.

(Gov't R4 at 15 ¶ 8) CO Koplos accepted the 18% but offset profit on freight to effectively lower the profit overall and account for his concern over the 18% being "somewhat high" (findings 30-32). CO Koplos disallowed $24,700 profit on freight (finding 29). However, MTI made a mistake when it mischaracterized the $24,700 as all profit; it actually included Labor, $5,659, Cranes, $1,400, Transporter, $1,050 and $16,591 profit. (findings 29-30) The Navy appropriately reduced the $24,700 to $16,591 to account for these other costs (findings 30, 32, 36 n.9). Even after this reduction to $16,591 or 11% profit[10] on freight, the Navy still objected to 18% profit on the barge and denied MTI recovery of the $16,591. The Navy does not explain why it continued to rely on the GSA's 18%.

Of particular importance is MTI's internal estimate that is unassailably credible (findings 19, 32). MTI discusses the estimate in its reply brief:[11]

> The Government's basis for the determination MTI's price was unfair and unreasonable, as noted in Clause 3 of their Initial Brief, is MTI included 18% profit on the fabrication/production of the barge. However, with all

---

[10] $16,591 / $148,200 = .112

[11] MTI filed its reply brief early so the Navy had it before filing its reply. In its reply brief the Navy did not comment on MTI's internal estimate or the quote from MTI's reply brief.

due respect, this is simply incorrect. As shown on MTI's estimate, which has been submitted on the record and is enclosed in this reply for reference to this specific claim, profit is clearly shown. The estimated profit for MTI was anticipated to be in the amount of $30,804.54 for the entire job in the amount of $280,627.31, which overall is less than a 15% profit on the entire job. Per industry standard, 15% markup has historically been considered fair and reasonable.

(App. reply br. at 1-2)[12]  MTI's internal estimate is in the record and attached to MTI's reply brief (findings 19, 32; app. reply br. at 5).  Profit on the entire contract, including the barge, was 11% not 18%. (Finding 19)  Simply put, Mr. Koplos mistakenly used the wrong number.  His denial of MTI's claim is tainted by this mistake which standing alone justifies our sustaining MTI's appeal, but there is more to consider.

*Price v. Cost Analysis*

Another significant problem with the Navy's analysis is that it used cost analysis for ratification of this small fixed-price contract.  FAR recognizes two methods to determine if a proposed price is reasonable, price analysis and cost analysis.  FAR 15.404-1 PROPOSAL ANALYSIS TECHNIQUES includes:

> (a)(2) Price analysis shall be used when certified cost or pricing data are not required (see paragraph (b) of this subsection and 15.404-3).
>
> (3) Cost analysis shall be used to evaluate the reasonableness of individual cost elements when certified cost or pricing data are required. Price analysis should be used to verify that the overall price offered is fair and reasonable. . . .
>
> (b) Price analysis for commercial and non-commercial items.
> (1) Price analysis is the process of examining and evaluating a proposed price *without evaluating its separate cost elements and proposed profit*.

---

[12] The Navy had MTI's reply brief before it filed its reply brief but choose not to comment on this quote.

(Emphasis added).  Cost analysis is only used when "certified cost or pricing data are required."  The FAR guidance quoted above is mandatory using "shall" in the text.  We see no reason why this FAR guidance would not apply in this appeal.

*Price Analysis was Used by the Navy to Negotiate the $280,627.31 before the DD 1149 was Signed*

From the record we have, this appears to have been a negotiated sole source fixed price small business contract.  From this record we see no evidence that Cost and Pricing data was required or requested in this time period.  Therefore, we conclude the Navy used price analysis to find the $280,627.31 reasonable.

In early August 2019, MTI learned about the Navy's need for a training barge in accordance with Navy drawings (findings 1-2).  Working with the Navy and GSA, MTI was responsive to the Navy's and GSA's requirements (findings 1-22).[13]  MTI obtained quotes from vendors for transportation to the Navy's desired delivery location (findings 11-14, 16-18).  MTI warned the Navy that its insistence on delivery to Williamsburg, VA required both water and land transportation that was "very costly" to the Navy (finding 15).  The total price mutually agreed to was $280,627.31.  The freight price of $148,200 was, as MTI predicted, greater than the price of the barge of $132,427.31. (Findings 19, 32)  On or about September 4, 2019, MTI and the Navy agreed on the total price of $280,627.31.  MTI's internal estimate, discussed above, calculated a total price of $280,627.31 with a total profit of $30,804.54 or 11%.  (*Id.*)  MTI did not calculate separate profit rates for the barge, water freight and land freight.  Mr. Koplos received MTI's internal estimate in September 2020 (finding 32) if not sooner[14] but it did not appear to have played a role in his analysis.  Without evidence to the contrary, we believe that 11% profit on the barge and a difficult and expensive freight contract is reasonable.  Also, the 20% profit on freight MTI initially provided to the Navy was mistaken and reduced to $16,591. (Findings 29, 36)  Based on the record before September 13, 2019, we conclude the Navy and MTI did a good job negotiating a reasonable price of $280,627.31 with a profit of 11% (findings 1-22).  We conclude that the Navy used price analysis, as it should have, to support the reasonableness of $280,627.31.  For sure the DD 1149 was an unauthorized commitment, but that doesn't mean the agreed upon price of $280,627.31 was unreasonable.  There is little evidence that the Navy considered what the parties did to agree on the $280,627.31 price before September 13, 2019.

---

[13] All these findings illustrate how MTI tried to satisfy the Navy's demands.
[14] MTI's internal cost estimate was certainly available before and after the DD 1149 was signed on September 13, 2019.

On or about September 13, 2019, Mr. Sakowski[15] signed a DD Form 1149 Requisition for MTI's barge at the agreed upon price of $280,627.31. Mr. Sakowski had no authority to bind the Navy in contract when he signed. (Finding 23) The requisition somehow got to MTI that relied upon it and constructed and delivered a barge that the Navy liked. (Finding 25) The DD 1149 was an unauthorized commitment. This mistake set in motion the Navy's ratification process that MTI got caught up in. It was however exacerbated by the Navy's use of cost analysis where Mr. Koplos requested cost data. (Finding 36)

Consideration of profit and/or quantum meruit (finding 36; gov't br. at 11 ¶ 38) are hallmarks of cost analysis. CO Koplos accepted GSA's price for the barge but thought GSA's 18% profit was high. (Finding 36) Turns out GSA's 18% was wrong. As we have said, MTI priced its bid with 11% profit not 18%. (Findings 19, 32) To account for the "objectionable" 18% CO Koplos disallowed the 20% ($24,700) mark-up on the freight. (Findings 31, 36) Also, he requested that MTI produce cost data including certified payrolls; MTI produced some cost data for "rigging." (Findings 32-33, 36 ) CO Koplos ultimately reduced the $24,700 to $16,591 to account for non-profit costs included in the $24,700 (findings 30, 36 n.9) but persisted in disallowing the $16,591 profit on freight. His decision unreasonably zeros out any profit on freight which was over half the contract price. MTI complained about this, "MTI is entitled to profit on the freight and should not be expected to offer this delivery to Government at Cost." (Finding 46) We agree. It is clear that CO Koplos based his decision on a cost analysis (he said so in his declaration (finding 36)) and repeated it in the Navy's brief (gov't br. at 4 ¶ 14). The Navy's use of cost analysis during ratification was inappropriate because there is no evidence cost and pricing data was required. Its use delayed and prejudiced MTI.

### The Navy's Ratification is Mistaken and Unreasonable

The Navy argues that MTI must prove that the Navy's conduct was "arbitrary, capricious, or otherwise contrary to law." (Gov't br. at 11 ¶40) We do not feel CO Koplos's actions were driven by any improper motivations, but do find, as a result of the mistaken use of the 18% profit and improper use of cost analysis, that CO Koplos' actions were contrary to the FAR provisions governing ratification. We question the predicate for his exercise of judgment in treating a firm fixed price contract as if it were a cost based contract.

---

[15] We do not single out Mr. Sakowski because he must have had a team supporting him. It is however inconceivable to us that no one on that team understood the most fundamental concept of government contracting which is actual authority is required to bind the government.

## CONCLUSION

Pursuant to the above MTI's appeal is sustained in the amount of $16,591. In its brief MTI suggests that interest should run from the January 21, 2020, the date of the first invoice, but an invoice alone is not a claim. We accept the Navy's date of November 30, 2020, for CDA interest to start accruing.

Dated: November 2, 2021

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62966, Appeal of Metal Trades, Inc., rendered in conformance with the Board's Charter.

Dated: November 3, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals